

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SUKUMARI NAIR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 03 C 6806 |
| vs. | ) |
| | ) Judge Joan H. Lefkow |
| ANTHONY J. PRINCIPI, Secretary, | ) |
| U.S. Department of Veterans Affairs, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sukumari Nair ("Nair") brings this employment discrimination lawsuit, alleging that her employer, the U.S. Department of Veterans Affairs ("VA"), subjected her to a hostile work environment on the basis of her national origin and retaliated against her for having complained of discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-1 *et seq.* The court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. Before the court are the VA's motion to strike and motion for summary judgment. For the reasons stated below, the court grants in part and denies in part the VA's motion to strike and grants the VA's motion for summary judgment.

## I. SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary

judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

## II. MOTION TO STRIKE

Before determining whether a genuine issue of material facts exists, the court must address the VA's motion to strike Nair's responses to the VA's Local Rule 56.1 statement of uncontested facts and portions of Nair's Local Rule 56.1 statement of additional facts.

The Local Rules provide detailed instructions as to how litigants should approach their summary judgment motions and responses. Pursuant to Local Rule 56.1(a), a party seeking summary judgment must file with its brief a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." Local Rule 56.1(a) establishes that the statement of material facts must "consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." Part (b) of Local Rule 56.1 requires the party opposing summary judgment to file a concise response to the

movant's statement of material facts. That statement is required to include a response to each numbered paragraph in the moving party's statement, including in the case of any disagreement, "specific references to the affidavits, parts of the record, and other supporting materials relied upon." The rule is very clear that "all material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party." Local Rule 56.1(b)(3)(B).

Nair's responses to paragraphs 2-7, 9, 11-12, 14, 16, 18-20, 23, and 25-28 of the VA's Local Rule 56.1 statement of uncontested facts either admit the VA's facts or fail to cite to any contradictory evidence. Many of these paragraphs also contain additional facts and/or legal arguments, neither of which is permitted by the local rules. *See Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("Rule 56.1(b)(3)(B) provides the *only* acceptable means of . . . presenting additional facts.") (citation and internal quotations omitted) (emphasis in original); *Cady v. Miss Paige, Ltd.*, No. 02 C 4867, 2004 U.S. Dist. LEXIS 7613, 2004 WL 1144044 (N.D. Ill. Apr. 30, 2004) ("Local Rule 56.1 . . . emphasizes that it is inappropriate to include legal conclusions and/or argument in the Rule 56.1 statements of fact.").

For example, Nair "denies defendant's characterization of Ms. Song's testimony" in response to paragraph 4 of the VA's Local Rule 56.1 statement of uncontested facts. Paragraph four states, "Hyunja Song, another nurse in the telemetry unit, testified that Nair harassed her coworkers by writing them up all the time," citing exhibit E at pages two and six. The court's review of the cited evidence reveals that Ms. Song was asked the following question: "So you don't think Ms. Nair is being harassed by her coworkers? You think Ms. Nair harasses her coworkers by writing them up all the time?" Ms. Song responded, "That is true." The testimony cited by Nair as contradicting

3

paragraph four was contained on page five of exhibit E. Ms. Song was asked, "You think that Ms. Nair is harassed?" She responded, "Because she writes up, you know, all people."[1] The court does not see how the evidence cited by Nair contradicts defendant's paragraph four, nor does the court believe that paragraph four mischaracterizes Ms. Song's testimony. Accordingly, the court strikes Nair's response to paragraph four.

Because Nair's responses to paragraphs 2-7, 9, 11, portions of 12,[2] 14, 16, 18-20, and 25-28 do not comply with Local Rule 56.1, the court strikes Nair's responses and deems admitted the facts contained in the VA's corresponding Local Rule 56.1 statement of uncontested facts. *See* L.R. 56.1(b)(3)(B); *McGuire v. United Postal Serv.*, 152 F.3d 673, 675 (7th Cir. 1998)("An answer that does not deny the allegations in the numbered paragraphs with citations to supporting evidence in the record constitutes an admission."). The court also strikes Nair's response to paragraph 24, which neither admits nor denies the facts stated in the VA's Local Rule 56.1 paragraph 24. Nair's response states: "Plaintiff has no direct knowledge that Ramos was detailed from Lakeside VA to Westside VA because of staff shortages." The VA's Local Rule 56.1 paragraph 24 is therefore deemed admitted.

---

[1] The court also notes that Ms. Song further clarified her statement about Ms. Nair being harassed. Ms. Song was asked, "You feel the coworkers are harassed by Ms. Nair?" She responded, "No. She does to other people." Exhibit E at 6. A follow-up question was then asked: "But I mean, just working, do you think her coworkers - - I mean, you know, you guys, do you harass Ms. Nair in any way?" Ms. Song answered, "No, I don't think so. No." *Id.*

[2] The court will not strike Nair's denial in paragraph 12 that Wszolek did not mention her EEO activities at that time. Plaintiff cited evidence contradicting that statement. *See* Nair Response at ¶ 12. For the same reason, the court will not strike Nair's denial in paragraph 23 that she refused to identify Ramos as the person who committed the assault. *See* Nair Response at ¶ 23.

4

## III. OBJECTIONS TO NAIR'S STATEMENT OF ADDITIONAL FACTS

In its response to Nair's statement of additional facts and its reply brief, the VA raises numerous challenges to the accuracy of Nair's portrayal of cited evidence and to the admissibility of cited evidence on hearsay grounds. *See* VA's response to ¶¶ 1, 5, 7-13, 15, 17, 20-22 of Nair's statement of additional facts. The court agrees with the VA that many of Nair's additional facts are misleading or mischaracterize the evidence. *See* Statement of Additional Facts ¶¶ 1, 5, 7-10, 12, 20, and 21. The court will only consider Nair's additional statement of material facts to the extent that the facts are supported by the cited evidence.[3]

---

[3] For example, in paragraph five, Nair cites Maglaya deposition exhibit six as evidence supporting the fact that Olivia Cruz and Conchita Ganaden are Filipino, but this exhibit mentions nothing of either Ms. Cruz or Ms. Ganaden being Filipino. She also cites this exhibit as supporting the statement that Ms. Cruz and Ms. Ganaden communicated only in their native language during work hours. Instead, the exhibit states: "[Ms. Cruz and Ms. Ganaden] persistently were conversing in their native language." Nair also claims in paragraph five that she advised Ms. Cruz and Ms. Ganaden "that the VA policy required that they use 'English Only' during work times," but the cited exhibit does not support this statement. Nair further claims in paragraph five that "Maglaya conceded . . . that it was mandatory for nurses to file reports when patient safety, improper care or inappropriate procedures were being followed by employees in the unit." Maglaya's deposition testimony, however, only supports the proposition that a nurse was required to file a written report when she perceived behavior constituting patient abuse. *See* Maglaya Dep. at 34-36.

Nair also overstates the cited evidence in paragraph eight. In that paragraph, Nair asserts that "Maglaya acknowledged that plaintiff filed several patient incident reports and reports of contact alleging that she was subject to harassment or unequal terms and conditions of employment," citing Maglaya deposition page thirty-six. The reports referred to by Maglaya, however, were limited to reports regarding patient care issues. Maglaya did not mention any reports of conduct, much less conduct alleging that Nair was subject to harassment or unequal terms and conditions of employment. Nair goes further, stating, "Maglaya also admitted that she regularly advised nurses in telemetry that it was the plaintiff who filed reports of contact and EEO complaints against them," citing Maglaya deposition page thirty-seven. Again, Maglaya only referred to reports regarding patient care. She did not mention any reports of contact or EEO complaints. A final, more minor misstatement comes in the last sentence of paragraph eight. Nair claims in that sentence that "Maglaya readily conceded that, after advising the nurses in the unit of plaintiff's reports, they became increasingly 'upset and angry' with plaintiff." Page 38 of Maglaya's deposition testimony, however, shows that the following exchange took place:
    Q.    Did you become aware that nurses working with Nair became angry at her for filing complaints with you?"
    A.    I think they indicated at one point that they told me, there was not written thing, that this is like a constant, whenever somebody - - whenever Miss Nair was the one who takes care of the patient, it was like something is always going to come up, that there is something that they do the right thing. So it's like Miss Nair and the rest of the staff members in the telemetry.
    Q.    So they became angry; is that fair to say?
    A.    They became upset.

The VA raises hearsay objections to paragraphs 1, 9, 10(c), 10(d), and 10(i), 13, 17, and 22. The court sustains the VA's objections to the hearsay statements contained in paragraphs 1, 10(c), 10(d), and 13 and portions of paragraphs 9, 17, and 22 of Nair's statement of additional facts. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) ("a party may not rely upon inadmissible hearsay . . . to oppose a motion for summary judgment."). In each of these paragraphs, Nair cites to an out-of-court statement for the purpose of establishing the truth of the matter asserted therein without identifying any exception to the general rule that hearsay is inadmissible. *See* Fed. R. Evid. 802. The court overrules the VA's objections to statements repeated by Nair during her deposition as to what her co-workers said to her directly or during a staff meeting for which Nair was present. *See* ¶¶ 9(a)-(c), and (e) and 10(i) of Nair's statement of additional facts. Such statements are not being offered to prove the truth of the matter asserted, e.g., "Oh you write everything else, every silly thing, and you keep going to the EEO. You think you are a perfect person," ¶ 9(a), but are offered instead for their effect on Nair. Since the VA does not deny such statements, the court deems them admitted.

## IV.   FACTS STATED IN A LIGHT MOST FAVORABLE TO NAIR

### A.   Background

Nair is a registered nurse employed in the telemetry unit of the VA's Westside Medical Center. Fatima Maglaya ("Maglaya") served as Nair's immediate supervisor from August 1998 until July 2001, when Eusebia Delfin ("Delfin") became Nair's supervisor. Darlene Modelski, the

---

This does not substantiate the quote that Nair attributes to Maglaya that the other nurses became increasingly "upset and angry." The VA also brings to the court's attention the fact that Maglaya specifically denied discussing Nair's EEO activity with any member of the staff.

Associate Chief Nurse, supervised both Maglaya and Delfin.

**B.     1995 and 2000 Complaints of Discrimination**

In June 1995 and July 2000, Nair filed administrative complaints of employment discrimination in which she alleged that two different supervisors had discriminated against her on the basis of her national origin. The VA and Nair resolved these complaints by entering into a settlement agreement on September 30, 2001. This settlement agreements provided, in part, that Nair waived all claims occurring prior to the execution of the settlement agreement and prohibited the VA from retaliating against Nair for filing the administrative complaints.

**C.     Events Giving Rise to Nair's Claims in the Present Lawsuit**

Nair's administrative complaints of discrimination and settlement agreement did not end her problems at work. On June 26, 2000, one of Nair's coworkers, Conchita Ganaden ("Ganaden"), told plaintiff that she was a "liar and that she should leave the VA." On May 1, 2001, another coworker, Bernice Wszolek ("Wszolek"), accused Nair of improperly caring for a patient. During this conversation, Wszolek informed Nair that she was a "paranoid jerk who should leave the hospital." Nair responded by filing reports of contact for each incident.[4]

---

[4] Nair also asserts that Modelski threatened Nair in June 2001 by "shouting at me that I write things and silly things, nonsense, and going to the EEO. They're nonsense . . . . If you continue to do this I am going to take actions to you. I am going to fire you." Nair gave this testimony at her deposition on March 31, 2004. This testimony directly contradicts her deposition testimony from February 28, 2003. During that deposition, Nair was asked whether any management officials had made any negative or biased comments about her prior EEO activity. Nair responded, "No, she did not directly state to me, but her actions, her facial expression and the way she take care of things, I can see." The court will disregard the allegation that Modelski threatened to fire Nair if she continued to write complaints and go to the EEOC because Nair has not offered any explanation for the contradiction in her testimony. "A party may not create a genuine issue of fact by contradicting his own earlier statements, at least without a plausible explanation for the sudden change of heart." *Richardson v. Bonds*, 860 F.2d 1427, 1433 (7th Cir. 1988). In any event, the court would not consider this conversation because, as explained below, it occurred prior to the execution of the settlement agreement.

Nair's reports of conduct were not limited to incidents involving herself. Although Nair had received satisfactory performance evaluations and had not received any disciplinary actions from 1998 through 2002, many of Nair's coworkers were not performing as successfully, at least in Nair's opinion. Almost daily, Nair filed reports regarding patient care issues in which she questioned the nursing care provided by her coworkers. For example, Nair filed a report on October 29, 2001 regarding the patient care provided by her coworker, Jane Shun-Hatch ("Shun-Hatch"). According to Nair's report, Shun-Hatch failed to provide proper care for a patient and later told Nair that she had forgotten about the patient.[5] After Nair filed these reports, Maglaya would conduct an investigation by informing the nurse whose performance was being questioned that Nair had filed a report about her performance and then questioning both Nair and the nurse in order to determine what happened.

Many of Nair's coworkers, including Modelski, Maglaya, Shun-Hatch, Benetta Weatherspoon ("Weatherspoon"), Hyunja Song ("Song"), and Bernice Wszolek ("Wszolek"), have stated generally that they believed that it was difficult to work with Nair and that many of the nurses in the telemetry unit disliked Nair. For example, Weatherspoon testified that she found it hard to get along with Nair because Nair was defensive and misinterpreted things. She also testified that most of the nurses tried to avoid Nair. Weatherspoon's sentiments were echoed by Song, Shun-Hatch, and Wszolek. Recognizing the tension between Nair and her coworkers, both Maglaya and Modelski attempted to speak with Nair about the situation with her coworkers.

---

[5] Nair has included this incident as evidence of the harassment she received in retaliation for filing her EEO complaints. The court is unclear as to how another employee's failure to properly care for a patient relates to Nair's claims in the present matter. Nair offers no evidence or argument that Shun-Hatch's failure to care for a patient properly related to Nair's national origin or was an act in retaliation against Nair. Nevertheless, for purposes of deciding the motion for summary judgment, the court included this incident in its consideration of Nair's claims.

8

In May 2001, Nair sent a letter to Modelski complaining that the other nurses in the telemetry unit were not treating her fairly. Modelski responded to Nair's complaints by asking a psychiatric nurse, Velma Barker-Hill, to meet with the nurses in the telemetry unit in an effort to improve communication between the nurses. The nurses met with the psychiatric nurse once a week for approximately two months. Maglaya noticed that staff communication had improved after these sessions. Unfortunately, this improved communication did not last.

On February 18, 2002, Ganaden accused Nair of improperly caring for a patient and said to her, "You keep record of EEO. You keep record of silly things, keep going to the EEO. You are a jerk. You are a liar." On June 14, 2002, Wszolek accused Nair of not bathing a patient. Nair memorialized the conversation in a memorandum entitled "Verbal Abuse from Co-Worker." The memorandum did not state that Wszolek said anything about Nair's EEO complaints. Nair later testified during her deposition in this matter that Wszolek said, "You – you paranoid . . ., you writing everything. You keep going to the EEO all the time. You putting us in trouble." Nair admitted, however, that Wszolek did not raise her voice or make any aggressive moves toward Nair.

Two days later, on June 16, 2002, Wszolek and Nair found themselves in another argument in which Wszolek told Nair that she needed a "psych evaluation" and that she did not understand how her husband tolerates her. When learning of this argument the following day, Delfin requested written reports from everyone who witnessed the argument. Delfin also provided Employee Assistance Program brochures to both Nair and Wszolek and scheduled time for both women to meet individually with the psychiatric nurse. In addition, Delfin scheduled a group meeting with the psychiatric nurse. Nair also sent a letter dated June 16, 2002 to Paula Stewart, the director of nursing, regarding this incident. Nair copied John Thomas ("Thomas"), the Equal Employment

Opportunity ("EEO") Program Director, on this letter. On July 28, 2002, Nair sent a follow-up letter to Thomas regarding this incident and the lack of progress on her request to resolve this incident.

On June 19, 2002, Evelyn Ramos, another nurse in the telemetry unit, poked Nair in the stomach with a pair of scissors.[6] On that occasion, Ganaden said referring to Nair, "[I]f she dies[,] her husband is going to make money out of it." The next morning, Nair went to Delfin.[7] Although not physically injured by the scissor incident, Nair told Delfin that her coworkers were attacking her and that it was very painful and shocking to her. She asked Delfin to stop her coworkers from attacking her. Delfin asked Nair who had done this to her. Nair replied, "Evelyn Ramos. But the other people were like making a sarcastic comment and they were laughing at me." According to Nair, Delfin said that she did not believe Nair and refused to assist Nair. Nair filed a formal report of contact regarding this incident on August 5, 2002. After receiving Nair's report, Delfin obtained written reports from Ramos and Ganaden. While Ganaden stated that she did not remember this incident, Ramos admitted that she pointed scissors at Nair but denied touching Nair with them. By the time that Delfin received the report, Ramos had returned to work at a different VA facility and Nair was on a medical leave of absence.

On August 2, 2002, Shun-Hatch was reporting a complaint about a patient assignment to the

---

[6]The court notes that Nair has not offered any evidence demonstrating that Ramos was attempting to harm her or that Ramos intentionally poked her with the scissors. Nair also does not describe the circumstances immediately preceding this incident or offer any background information regarding her relationship with Ramos, who was a nurse temporarily assigned to the Westside Medical Center from a different VA hospital.

[7]Delfin recalls a very different versions of the conversation. According to Delfin, Nair asked her how she would feel if someone pointed scissors at her abdomen. Delfin replied that it was unacceptable behavior and asked Nair to elaborate. According to Delfin, Nair refused to provide any details and said that she was just asking for an opinion. Delfin's version of the conversation is substantiated further by her memorandum dated June 19, 2002 in which she quoted Nair as saying, "How do I feel if someone will point scissors to my abdomen[?]" The memorandum further noted that Nair refused to mention any names and that Delfin informed Nair that it would be difficult for her to investigate Nair's accusation without knowing who was involved in the incident.

night-shift nurse when Nair interrupted the conversation. Rather than respond to Nair, Shun-Hatch pushed her chair away, covered her ears, and informed Nair that she did not want to talk to her because her prior experience with Nair had led her to believe that the situation would worsen. Nair filed a report of conduct regarding this incident. Delfin was in a meeting with the psychiatric nurse when she was paged and informed that there was a problem in the telemetry unit. Both Delfin and the psychiatric nurse went to the telemetry unit and met immediately with the entire staff about the incident between Shun-Hatch and Nair. During the meeting, some of the other nurses in the telemetry unit asked that Nair be removed from the unit because "[s]he writes things, go [sic] to the EEO, and she write memos to the nurse manager. She [is] putting us in trouble. We don't want to work with her." At the end of the meeting, the nurses performed the tasks assigned by the night-shift nurse. After the meeting, Nair requested a transfer to another department; this request was granted. Delfin again referred Nair to the Employee Assistance Program.

On August 5, 2002, Nair presented a doctors note to Delfin indicating that Nair was unable to work. That day, Nair consulted with Dr. Inder Paul Singh, M.D., A.B.F.P., a Board Certified family practitioner and Nair's family physician since 1996. After meeting with Nair, Dr. Singh sent a memorandum to the VA in which he indicated that Nair suffered from "acute stress reaction." On August 13, 2002, Dr. Singh referred Nair to Dr. Ok Ro Hong, M.D., a Board Certified psychiatrist, for a diagnostic evaluation. Dr. Hong diagnosed Nair as suffering from post-traumatic stress disorder, panic disorder, and major depression. Nair subsequently sought psychiatric treatment from Dr. Dickey Kay, a Board Certified psychiatrist. Dr. Kay diagnosed Nair as suffering from major depression and possible post-traumatic stress disorder. Dr. Kay noted that Nair was only able to sleep four to five hours per night; she lacked concentration at work; she experienced feelings of

helplessness and frustration; she suffered from panic syndrome; she had feelings of being cold and clammy at work; she had feelings of shock, shortness of breath, and burning sensations in her chest; she also experienced faintness and disorientation at work; and she had choking feelings and palpitations. Based on his discussions with Nair, Dr. Kay had the general sense that Nair felt ostracized and alienated at work and, at least according to Nair, was mistreated verbally at work. Nair took a medical leave of absence from August 2, 2002 until February 18, 2003.

On October 5, 2002, counsel for Nair sent correspondence in which he indicated his status as Nair's counsel to Gregory Daniels ("Daniels"), Sr., EEO Counselor. In the letter, counsel advised Daniels of Nair's prior contacts with Thomas and that the EEO charge was a claim for a "continuing violation." That same day, Nair filed an administrative complaint of employment discrimination, alleging that her coworkers harassed her and subjected her to a hostile work environment because of her national origin (Indian) and retaliated against her.

Dr. Kay released Nair to return to work on February 4, 2003. He recommended that Nair be reassigned to a different department. Nair returned to work on February 18, 2003. She was reassigned to work in the Medical Surgical Unit.

## ANALYSIS

Nair filed the present lawsuit in September 2003, alleging that the VA subjected her to a hostile work environment because of her national origin and retaliated against her for filing complaints of discrimination. The VA moves for summary judgment on both claims.

I.      **The Settlement Agreement**

In acceding to the September 30, 2001 settlement agreement, Nair agreed to waive all claims

occurring prior to the execution of the settlement agreement. In light of this agreement, the VA argues that Nair has waived any claims with regard to the incidents that occurred on June 26, 2000 and May 1, 2001. *See, e.g., Wagner v. The Nutrasweet Co.*, 95 F.3d 527, 532 (7th Cir. 1996) ("a plaintiff may waive a claim under Title VII . . . as part of a voluntary settlement, provided that her consent to the release was voluntary and knowing."). Nair has made no showing that her consent to the release was anything but voluntary and knowing. In fact, Nair failed to respond to the VA's argument regarding the effect of the settlement agreement on the incidents occurring before the settlement agreement was executed. As a result, the court will not include either the June 26, 2000 or May 1, 2001 incident in its analysis.[8]

## II. Hostile Work Environment

Title VII makes it unlawful for an employer to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2. An employer violates Title VII if it is responsible for a "hostile work environment." *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421 at 426 (7th Cir. 2004), citing *Mason v. Southern Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000). A plaintiff establishes a hostile work environment claim based on national origin by demonstrating that (1) she was subject to unwelcome harassment; (2) the

---

[8]Initially, the VA also argued that the court should exclude the events that occurred on June 26, 2000, May 1, 2001, October 29, 2001, and February 18, 2002 from its analysis because Nair failed to exhaust her administrative remedies for these claims. According to 29 C.F.R. § 1614.105(a)(1), federal employees much contact an EEO counselor within 45 days of allegedly discriminatory acts if they want to challenge the discrimination. In this case, Nair first contacted an EEO counselor on June 16, 2002. The 45th day prior to June 16, 2000 was May 2, 2002. As a result, all claims that arose prior to May 2, 2002 would be considered untimely. In its reply, however, the VA waived its objection to the court's consideration of Nair's October 29 and February 18 claims as part of Nair's hostile work environment claims. Accordingly, the court will consider Nair's October 29 and February 18 in its analysis.

harassment was based on her national origin; (3) the harassment was so severe or pervasive as to alter the conditions of the employee's environment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Id.* To qualify as hostile, "the work environment must be both objectively and subjectively offensive." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004). In deciding whether the a workplace is hostile, the court considers the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464 at 467 (7th Cir. 1998), quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 at 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993).

The evidence presented by Nair in order to establish that she was subjected to a hostile work environment consists of (1) the October 29, 2001 incident in which Shun-Hatch failed to give proper care for a patient; (2) the February 18, 2002 incident in which Ganaden stated that Nair was "keeping a record of everything and going to the EEO;" (3) the June 14, 2002 incident in which Wszolek accused Nair of failing to give proper care to a patient and constantly going to the EEO; (4) the June 16, 2002 incident in which Wszolek told Nair that she need a "psych evaluation" and that she felt sorry for Nair's husband; (5) the June 19, 2002 incident in which Ramos poked Nair in the stomach with scissors and Ganaden said that Nair's husband would make a lot of money if Nair died; and (6) the August 2, 2002 incident in which Shun-Hatch disagreed with a patient assignment and told Nair that she did not want to speak with her. While the evidence shows that Nair's coworkers did not like working with her, absent from this evidence is any relationship between Nair's treatment by her coworkers and Nair's national origin. Nair has not offered evidence that any of the incidents

involved racial or ethnic slurs or comments regarding her national origin. In the absence of evidence connecting the harassment to her national origin, Nair's hostile work environment claim fails.

## III. Retaliation

The VA also argues that it is entitled to summary judgment on Nair's claim of retaliation. Nair may establish a *prima facie* claim of retaliation in two ways. The first approach requires Nair to "present direct evidence (evidence that establishes without resort to inference from circumstantial evidence) that plaintiff engaged in protected activity (filing a charge of discrimination) and as a result suffers the adverse employment action of which [she] complains." *Hudson v. Chicago Transit Auth.*, 375 F. 552 at 559 (7th Cir. 2004), quoting *Stone v. City of Indianapolis Public Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). The alternative approach, adapted from the indirect method of proving discrimination set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), requires Nair to demonstrate "that, after filing a charge, the plaintiff was subject to an adverse employment action even though [she] was performing [her] job satisfactorily and no similarly situated employees who did not file a charge was subjected to the adverse employment action." *Id.* If she establishes these elements, the VA bears the burden of producing a legitimate, nondiscriminatory reason for its actions. Once this reason is produced, Nair must prove that the reason is pretextual. *Id.* Nair confines her argument to the indirect approach, and the court will do the same.

The parties agree that Nair engaged in protected activity by filing her EEO complaints of discrimination, was performing her job satisfactorily, and was not subjected to any disciplinary actions. Despite this satisfactory job performance, Nair claims that she was subjected to an adverse

15

employment action by her employer in the form of a hostile work environment based on her EEO activity. The Seventh Circuit has recognized three types of actions as "adverse employment actions": (1) instances where the employee's compensation or other financial terms of employment are diminished; (2) cases where a nominally lateral transfer with no change in financial terms significantly reduces an employee's career prospects by preventing her from using the skills in which she is trained and experienced; and (3) instances where conditions are changed in a negative way. *Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002). This third category "includes cases of harassment, such as mistreatment of an employee by a coworker or supervisor that is sufficiently severe to worsen severe to worsen substantially [her] conditions of employment as they would be perceived by a reasonable person in the position of the employee." *Id.* at 745, citing *Faragher v. Boca Raton*, 524 U.S. 775, 786-88, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998); *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462-63 (7th Cir. 2002).

In this case, Nair is contending that the VA retaliated against her for filing her EEO complaints by creating a hostile work environment based on her EEO activity.[9] The primary basis offered by Nair in support of this argument is her unsupported allegation that her supervisors, Maglaya and Delfin, openly advised the other nurses within the telemetry unit that Nair was filing EEO reports and reports of contact against them. As the court noted previously, the supporting materials cited by Nair do not substantiate the allegation that Nair's supervisors informed her

---

[9]The Seventh Circuit has recognized that the creation of a hostile work environment can be a form of retaliation. *See Knox v. State of Ind.*, 93 F.3d 1327, 1334 (7th Cir. 1996) ("There is nothing in the law of retaliation that restricts the type of retaliatory act that might be visited upon an employee who seeks to invoke her rights by filing a complaint . . . No one would question the retaliatory effect of many actions that put the complainant in a more unfriendly working environment . . . .").

16

coworkers of Nair's EEO activity.[10] Nair further stretches these allegations by asserting that her supervisors "turned the staff loose" to harass Nair and drive her out of the unit but offers no evidence in support of this allegation.[11]

Instead, the actual evidence presented by Nair in support of her claim of retaliation establishes that her coworkers mentioned Nair's EEO activity on two occasions during their disagreements with her; a coworker told Nair that she needed a "psych exam"; a coworker refused to speak to Nair; and a coworker poked her in the stomach with scissors while another coworker told her that her husband would make a lot of money if she died. Although Nair has testified that she found the scissor incident painful and shocking, it was an isolated incident that did not cause physical harm to Nair. In addition, Nair has not shown that the incidents involving the "psych exam" comment, her coworker's refusal to speak with her, or the scissors bore any relation to her EEO activity. *But cf. Smith* v. *Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999) (female prison guard who was assaulted by male coworker presented sufficient evidence to raise the necessary inference under Title VII that the assault was based on her sex, and not randomly violent, by presenting affidavits of other guards documenting his recurrent hostile behavior toward female coworkers). Nair's evidence, taken as a whole, fails to raise a genuine issue of material fact regarding whether she was subjected to an adverse employment action because the harassment she experienced was not so severe or pervasive as to create an objectively abusive work environment. *See Faragher* v. *Boca Raton*, 524 U.S. 775, 788, 141 L. Ed. 2d 662, 118 S. Ct. 2275 ("[S]imple teasing, offhand comments, and isolated

---

[10]*See, supra*, note 3.

[11] While the evidence shows that Nair's supervisors informed Nair's colleagues of Nair's reports questioning their care of patients, the evidence shows that such disclosures were confined to the supervisors' investigations of these reports.

incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.") (internal quotations and citations omitted).

Even assuming that Nair established that she was subjected to an adverse employment action, Nair's claim of retaliation must fail because Nair has not identified any similarly situated employees who were treated more favorably. The entire argument offered by Nair regarding this element of a *prima facie* case of retaliation is confined to the following statement: "[S]imilarly situated co-workers were not disciplined for engaging in the harassment and, in fact, were actually encouraged by their supervisors to continue to harass plaintiff because of her EEO activities." Nair Response at 13. This conclusional statement does not specify who the similarly situated co-workers were or address whether they filed any complaints of discrimination or were treated more favorably than Nair. By failing to identify a single coworker who is "directly comparable in all material respects" to Nair, Nair cannot satisfy the indirect method for establishing a claim of retaliation. *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004). Accordingly, the VA is entitled to summary judgment on Nair's claim of retaliation.

## ORDER

For the reasons stated above, the court grants in part and denies in part the VA's motion to strike [#15] and grants the VA's motion for summary judgment [#8]. The clerk is instructed to enter judgment in favor of the defendant. All future dates, are stricken. This case is terminated.

Enter: _____

JOAN HUMPHREY LEFKOW

Date: AUG 1 0 2005

United States District Judge